**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

ROSARIO MONTEVAGO        *
                              *
        v.               *
                              *
U.S. AIRWAYS, INC.        *
                              *    Civil Action WMN-09-CV-1212
and                     *
                              *
INTERNATIONAL ASSOCIATION OF   *
MACHINISTS AND AEROSPACE,      *
LODGE 141                 *

      *     *     *     *     *     *     *     *     *     *     *     *

**<u>MEMORANDUM</u>**

This case arises from the termination of Plaintiff Rosario Montevago from his position as a Fleet Service Lead Agent with U.S. Airways at Ronald Reagan National Airport (DCA). In his position, Mr. Montevago was a member of the International Association of Machinists and Aerospace (IAMA or Union). The terms and conditions of his employment were set forth in a collective bargaining agreement (CBA) between U.S. Airways and IAMA. Following his termination, Mr. Montevago filed a grievance challenging that termination. That grievance was ultimately heard by the U.S. Airways-IAMA System Board of Adjustment, the arbitral board established by the parties pursuant to the Railway Labor Act, 45 U.S.C. §§151 <u>et</u> <u>seq.,</u> (RLA). At the hearing, the IAMA represented Mr. Montevago in presenting his grievance. The System Board upheld Mr.

Montevago's discharge.  Mr. Montevago then filed this action against U.S. Airways for breach of the CBA and the IAMA for breach of its duty of fair representation.

Before the Court are Defendants U.S. Airways' and IAMA's Motions to Dismiss.  Papers 18 and 20.  The Motions have been fully briefed and are ripe.  Upon review of the pleadings and the applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and that both Motions to Dismiss will be granted.

## I.   BACKGROUND

According to Mr. Montevago's Complaint, the event precipitating his termination was a confrontation with a fleet service agent whom Mr. Montevago was leading.  Mr. Montevago alleges that as a lead agent, his duties included those of a fleet service agent as well as some additional duties relating to leading and directing the work of other fleet service agents such as assigning tasks to the agents on his team and overseeing their work.  A lead agent is not considered "management," however, under the CBA.

On May 9, 2007, Mr. Montevago alleges that, while working as a lead agent, he instructed fleet service agent Standley Brady to provide water service to an aircraft that they were servicing in preparation for a flight.  Mr. Brady allegedly responded that "Mr. Montevago does nothing and that he should

put the [expletive] water on the plane himself." Mr. Montevago
claims to have responded by telling Mr. Brady to not use that
type of language and reiterated his request for Mr. Brady to put
the water on the plane. Mr. Montevago alleges that Mr. Brady
then hit him in the face. U.S. Airways investigated the
incident and concluded that Mr. Montevago had participated in
using language that violated their zero tolerance policy, that
he did not hit Mr. Brady, that the altercation took place in an
area where U.S. Airways customers could view the event and that
he provided false statements during the company investigation.
According to Mr. Montevago, U.S. Airways thus determined that he
violated four of its Conduct Rules and the Zero Tolerance
Policy. Combined with two previous incidents for which he had
been counseled, U.S. Airways terminated his employment.

According to Mr. Montevago's Complaint, the first incident
for which he was counseled took place on October 29, 2006, when,
while working as a fleet service agent, but not a lead agent, he
had a verbal confrontation with another U.S. Airways employee.
Ms. Jay Jay Lavine, Station Director, allegedly conducted an
investigation and concluded that Mr. Montevago had violated the
company's Zero Tolerance Policy. Initially Mr. Montevago was
given two days suspension without pay, but after the Union
processed a grievance against the discipline, it was reduced to
a one day suspension with pay. As part of the reduction in

discipline, Mr. Montevago expressed remorse and represented that he would be prepared to walk away when confronted and would not confront another employee.

The second incident involved a complaint filed by another employee alleging that Mr. Montevago had made a discriminatory statement on February 18, 2007, while assigning the flights and that Mr. Montevago was assigning flights in a discriminatory fashion against non-whites.  According to Mr. Montevago, Ms. Lavine again conducted an investigation and determined that Mr. Montevago had made a derogatory statement that violated the Zero Tolerance policy, but found that he had not assigned work in an inequitable manner.  Because Ms. Lavine took more than 14 days to finish the investigation, however, she could not discipline Mr. Montevago per the CBA.  Instead, Ms. Lavine counseled Mr. Montevago about the Zero Tolerance policy.

Mr. Montevago has now brought this suit against the Union in relation to its representation of Mr. Montevago's grievance before the U.S. Airways-IAMAW Board.  Mr. Montevago alleges that the breached its duty of fair representation by failing to prepare for the arbitration, failing to consider the need for crucial witnesses, failing to bring out bias, failing to question U.S. Airways' improper application of the Zero Tolerance Policy, failing to question U.S. Airways' improper reliance on findings flowing from the February 18, 2007

4

incident, failing to subpoena two important witnesses, failing to address the credibility of certain witnesses, failing to bring up Mr. Brady's prior discrimination claim against his former employer and its similarity to the accusations he made against Mr. Montevago and U.S. Airways, and failing to question U.S. Airways' motivation for terminating Mr. Montevago, which he alleges was in order to deter Mr. Brady from filing a discrimination claim against it.

Mr. Montevago's claim against U.S. Airways is that it breached the CBA by a) misapplying its Zero Tolerance Policy; 2) ignoring credible statements of its own employees who corroborated Mr. Montevago's version of events of May 9, 2007; c) applying the term "confront" over broadly and in such a way as to make it impractical for Mr. Montevago to perform his duties as lead agent; d) terminating Mr. Montevago to make itself look nondiscriminatory; e) applying the Zero Tolerance Policy arbitrarily; f) treating a counseling as if it were a discipline and relying on same as a partial basis to terminate Mr. Montevago, yet not allowing him the due process of the grievance process; and g) failing to support Mr. Montevago as a lead agent.

## II.  LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, . . . , to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556).  "Detailed factual allegations" are not required, but allegations must be more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action[.]" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 555). "[O]nce a claim has been stated adequately," however, "it may be supported by showing any set of facts consistent with the allegations in the complaint." Twombly, 550 U.S. at 563.  In considering such a motion, the court is required to accept as true all well-pled allegations in the complaint, and to construe the facts and reasonable inferences from those facts in the light most favorable to the plaintiff.  Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997) (citing Little v. Federal Bureau of Investigation, 1 F.3d 255, 256 (4th Cir. 1993)).

## III. DISCUSSION

This dispute is governed by the RLA which provides that disputes between employees and air carriers "growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions" must be submitted to final and binding arbitration before the System Board created by the labor union and carrier. 45 U.S.C. § 184.  See also Consolidated Rail Corp. v. Ry. Labor Executives Ass'n, 491 U.S. 299, 303-04 (1989).  The ability of courts to review the final award of the Adjustment Board is very limited.  Id.  See also Consolidated Rail Corp., 491 U.S. at 303-04 (1989).  Courts have recognized, however, that, in cases such as here, unions have a duty to represent their members fairly under the RLA and on that ground, district courts have jurisdiction to hear breach of fair representation claims against the union.  Dement v. Richmond, Fredericksburg & Potomac Railroad Co., 845 F.2d 451, 457 (4th Cir. 1988).[1]  "Since Steel v. Louisville, . . . the duty of fair representation has served

---

[1] As noted by the Fourth Circuit in Dement v. Richmond, Fredericksburg & Potomac Railroad Co., "the scope and nature of the statutory duty of representation are identical with respect to hybrid suits [, involving claims against both the union and the employer,] brought under both [the Labor Management Relations Act (LMRA), 29 U.S.C. §§ 141-187, and the RLA]." Dement, 845 F.2d at 457 n. 12.  Thus, except as otherwise required, the Court will apply breach of fair representation cases decided under the LMRA and the RLA without distinguishing between them.  Id.

as a 'bulwark to prevent arbitrary union conduct against
individuals stripped of traditional forms of redress by the
provisions of federal labor law.'" Hines v. Anchor Motor
Freight, Inc., 424 U.S. 554, 564 (1976) (quoting Vaca v. Sipes,
386 U.S. 171, 182 (1967)).

When "the union's breach of duty 'seriously undermines the
integrity of the arbitral process, the union's breach also
removes the bar of the finality provisions of the [statute].'"
Williams v. Air Wisconsin, 874 F. Supp. 710, 715 (E.D. Vir.
1995) (quoting Hines, 424 U.S. at 567 (1976)).  Thus, a claim
for breach of the CBA can only lie against the employer if the
Union is found to have breached its duty of fair representation
and "if the employer's conduct somehow contributed to the
union's breach." Dement, 845 F.2d at 457 (4th Cir. 1988).
Moreover, the breach of duty must be shown to have contributed
to the erroneous outcome.  Ash v. United Parcel Service, Inc.,
800 F.2d 409, 411 (4th Cir. 1986) (quoting Hardee, 537 F.2d
1255, 1258 (4th Cir. 1976)).

Unions are to be granted a large measure of deference in
representing employees.  Thompson v. Verizon Maryland, Inc., 140
F. Supp. 2d 546, 551 (D. Md. 2001) (citing Vaca, 386 U.S. at
176).  Thus the barrier to establishing a breach of fair
representation is high in order to prevent courts from
substituting their own view of the proper outcome for that

determined in the arbitration process.  Id. (quoting Air Line
Pilots Assoc., Int'l v. O'Neill, 499 U.S. 65, 78 (1991)).  In
order to establish that a union breached its duty of fair
representation, an employee must establish that the union acted
in a manner that was "arbitrary, discriminatory, or in bad
faith."  Vaca, 386 U.S. at 190.  "To be 'arbitrary,' a union's
conduct towards its member must be so far outside a wide range
of reasonableness that it is wholly irrational."  Thompson v.
Aluminum Co. of America, 276 F.3d 651, 657 (4th Cir. 2002)
(citing Air Line Pilots Ass'n, 499 U.S. at 78).  "The analysis
of whether a union's actions were arbitrary looks to the
objective adequacy of that union's conduct."  Id. at 658.
"Simple negligence, ineffectiveness, or poor judgment is
insufficient to establish a breach of the union's duty."  Ash v.
United Parcel Service, 800 F.2d 409, 411 (4th Cir. 1986).  "A
union's exercise of its judgment need not appear as wise in
hindsight, and a violation of the duty of fair representation is
not made out by proof that the union made a mistake in
judgment."  Aluminum Co. of America, 276 F.3d at 658.  "Rather,
the union's conduct must be 'grossly deficient' or in reckless
disregard of the member's rights."  Ash, 800 F.2d at 411.

The analysis of discrimination and bad faith, on the other
hand, focuses "on the subjective motivation of the union
officials."  Id.  "[A] union's conduct is considered to be

discriminatory if the union's actions are invidious." <u>Verizon
Maryland</u>, 140 F. Supp. 2d at 551.  "'[D]iscrimination is
invidious if based upon impermissible or immutable
classifications such as race or other constitutionally protected
categories, or arises from prejudice or animus.'"  <u>Id.</u> (quoting
<u>Considine v. Newspaper Agency Corp.</u>, 43 F.3d 1349, 1359-60 (10th
Cir. 1994)).  Bad faith is established "'by a showing of fraud,
or deceitful or dishonest action.'"  <u>Id.</u>

     First, Mr. Montevago alleges that had the Union called two
witnesses, instead of only one, supporting his contention that
he attempted to walk away from the confrontation with Mr. Brady
that the Board would have found that he had attempted to walk
away.  Yet Mr. Montevago admits in his Complaint that he did not
attempt to walk away at the first opportunity, which is
specifically what the Board focused on in its Opinion.[2]  Opinion
and Award, Grievance No. 15495F, Aug. 15, 2008, 11-12.
Moreover, his testimony during the hearing suggests that while

---

[2] On a motion to dismiss pursuant to Federal Rule of Civil
Procedure 12(b)(6), a district court generally may not consider
any material beyond the pleadings.  <u>See</u> <u>Phillips v. LCI Int'l
Inc.</u>, 190 F.3d 609, 618 (4th Cir. 1999).  The Court may consider
material attached to the motion to dismiss, however, that "was
integral to and explicitly relied on in the complaint and [if]
the plaintiffs do not challenge its authenticity."  <u>Phillips v.
LCI Int'l Inc.</u>, 190 F.3d at 618 (internal citations omitted**).**
Here, Plaintiff refers to the System Board's decision in his
Complaint and has not challenged the submission of the copy of
the decision attached to Defendants' Motions to Dismiss.
Therefore, the Court has referenced it in its decision.

he turned away, he repeatedly turned back toward Mr. Brady and

did not finally walk away until Mr. Holloway came and stood

between him and Mr. Brady.[3]   Arb. Tr. 157-58.   Thus, the second

witness would have provided, at most, duplicative testimony of

one already called and would do nothing to change the damage

that Mr. Montevago did to himself with his own testimony.

Moreover, it is questionable whether the Board could have

summoned the second witness in any case as he was not an

employee of U.S. Airways and the CBA provides only that "[t]he

Board may summon any witnesses who are employed by the Company."

CBA, Art. 21, I.

    Mr. Montevago defends his assertion that he attempted to

walk away by arguing that his response to Mr. Brady was not a

---

[3] See discussion supra note 2.  Plaintiff has referenced the
testimony and actions of the Union representative during the
arbitration hearing.  As Plaintiff has not objected to the
copies of the arbitration transcript attached to Defendants'
Motions to Dismiss, the Court has referenced them in its
decision.  Mr. Montevago's testimony was that after he asked Mr.
Brady to get the water and Mr. Brady responded by cursing at him
he then turned around, but turned back to Mr. Brady to tell him
not to swear at him at which time Mr. Brady hit him, which
pushed him away.  Mr. Montevago testified that Mr. Brady kept
walking toward him telling Mr. Montevago not to touch him, at
which time Mr. Montevago turned on his microphone for other
people to hear what was happening at the gate.  Mr. Montevago
said that he "turned around and said to him you can say what –
he was cussing me, he was saying lot of things."  Mr. Montevago
said that he again turned away, but Mr. Brady was still coming
towards him until "Mr. Holloway, he was about 10, 15 feet away,
he came and he stood between us, and he push me, I mean he push
me – he put – he was so close that he had to walk this way in
between us and push us apart.  And turn around – once he come
there I turn around and I walk away.  I walk away."

failure to walk away from a confrontation in violation of his earlier commitment to do so, but, rather, he argues that he was just doing his job as a lead agent.  Mr. Montevago does not allege, however, that the Union representative failed to make this argument.  Instead, he argues that the two instances of discipline, including where he promised to walk away from future confrontations, should not have been allowed into evidence.  To the extent that they were allowed, he contends that they should have been challenged with vigorous questioning.

First, he claims that the Zero Tolerance Policy relates only to discrimination and that neither previous incident involved discrimination so they should not have been relied upon to justify his termination.  Second he contends that the second counseling should not have been admitted because he did not have a chance to grieve it.  Mr. Montevago provides no legal rationale for the inadmissibility of the two incidents, however, nor any indication that, had the Union challenged the admissibility of these two incidents, the arbitration panel would have prohibited their admission.  Moreover, he himself testified that he understood that the Zero Tolerance Policy had a broader application than just to discrimination.  In relation to his response to Mr. Brady after Mr. Brady cursed at him, Mr. Montevago said that he was "aware of the Zero Tolerance Policy from US Air and all the rules they got about cussing, and being

involved in previous incidents." Arb. Tr. 157.  In one statement
Mr. Montevago acknowledged his prior "incidents" and his
knowledge about the broader application of the Zero Tolerance
Policy.  At most the Union's failure to challenge the second
disciplinary action, which was not grieved, may have amounted to
a mistake, but it does not rise to the level needed to suggest
arbitrary representation.

Mr. Montevago also contends that additional witnesses
should have been called and additional questions asked to
counter Mr. Holloway's testimony that he cursed at Mr. Brady and
that he nodded his head in an aggressive manner.  The first
piece of evidence that Mr. Montevago contends should have been
introduced is Mr. Brady's written statement regarding the
incident.  Mr. Montevago alleges that Mr. Brady never said that
Mr. Montevago cursed at him.  Mr. Montevago also claims that the
Union representative should have questioned another employee who
allegedly heard Mr. Brady screaming at Mr. Montevago over the
radio, but did not identify Mr. Montevago as making any
statements or using profanity.  Neither Mr. Brady nor the other
employee, however, state that Mr. Montevago did not curse.
Rather, Mr. Montevago argues that the absence of their stating
that he cursed is evidence that he did not curse.   Whether it
can be said that in hindsight the decision to not introduce such
"absence of evidence" evidence was a mistake, it most certainly

was not arbitrary representation, particularly since Mr.
Holloway testified explicitly that he heard Mr. Montevago curse
at Mr. Brady.  Moreover, the Court can imagine any number of
reasons that the Union would choose not to present such
evidence, not least of which is the potentially damaging effect
of introducing Mr. Brady's most likely negative view of the
incident.

To this same end, Mr. Montevago alleges that the Union
representative's questioning of Ms. Aldrich was insufficient.
Mr. Montevago contends that Ms. Aldrich testified that she could
not hear Mr. Montevago using profanity.  He contends that had
the Union emphasized that Ms. Aldrich was standing closer to the
incident than Mr. Holloway, it would have given her testimony on
this issue more weight than Mr. Holloway's.  Notably, however,
Mr. Montevago does not allege that Ms. Aldrich stated that he
did not use profanity, only that she could not hear it.  Thus,
as with Mr. Brady's statement and the testimony of the other
employee, Mr. Montevago's allegation is that the absence of her
hearing him curse means that he didn't curse and should trump
Mr. Holloway's testimony.  Here again, at most the failure to
elucidate such testimony could be considered negligent, but
hardly "wholly irrational," particularly when only Mr. Holloway
could testify as to actually hearing what Mr. Montevago said.

Nor can it be said that knowing their different locations
would likely have changed the Board's decision.  The Board
determined that Mr. Holloway's testimony was more reliable
because he was actively watching the incident.  Opinion and
Award, Grievance No. 15495F, Aug. 15, 2008, 12.  Ms. Aldrich, on
the other hand, was busy helping passengers while the incident
was occurring.  Id.  Thus, outside Mr. Holloway being too far
away to hear or observe adequately, his location versus that of
Ms. Aldrich would not be likely to change the Board's opinion as
to whose testimony was more reliable.

Mr. Montevago also contends that the Union representative
should have asked Ms. Aldrich regarding a head gesture that the
Board found to be aggressive based on the testimony of Mr.
Holloway.  The Union representative had already brought out Ms.
Aldrich's statement that the gesture was a helpful one, however,
when it questioned Ms. Lavine, the investigator.  Arb. Tr. 54-
55.  Thus, it is reasonable that the Union representative may
have chosen to avoid presenting duplicative evidence.  Moreover,
Mr. Montevago does not show how presenting the duplicative
evidence is likely to have changed the Board's decision in light
of its finding that Mr. Holloway's testimony was more reliable
than Ms. Aldrich's.

Finally, Mr. Montevago alleges that the Union should have
brought out at the hearing that US Airways had an incentive to

15

terminate Mr. Montevago in order to avoid a discrimination
Complaint by Mr. Brady.  To that end, Mr. Montevago contends
that the Union should have introduced evidence of Mr. Brady's
discrimination lawsuit against his former employer and Mr.
Brady's statement of the incident.  A decision to not present
such evidence is not outside the wide range of reasonableness,
however.  First, as already mentioned, it is conceivable that
Mr. Brady's statement would be more injurious to Mr. Montevago
than helpful.  It is also not clear from Mr. Montevago's
Complaint that evidence of Mr. Brady's lawsuit would even be
admissible in the proceedings.  Moreover, the evidence is not
compelling enough, without more, to establish that U.S. Airways
sole reason for terminating Mr. Montevago was to deter a
discrimination Complaint by Mr. Brady.  Thus, the failure to
introduce the evidence suggested by Mr. Montevago was at most a
mistake, although not likely irrational given the potential
negative effect that it could have had.  In addition, it was not
compelling enough to have likely changed the decision of the
Board in light of the factual determinations they made.

    None of Mr. Montevago's allegations supports a claim of
discrimination or bad faith, but rather, they reflect on whether
the union's representation at the hearing was arbitrary or not.[4]

---

[4] Mr. Montevago makes one additional allegation, that the Union
did not provide him with the arbitration decision for almost

His claims, however, neither individually nor in the aggregate,
rise to the level necessary to overcome the deference to be
given to unions in their representation of their members.   The
duty of fair representation does not even require a union to
appeal a grievance to arbitration if the union believes that it
will not prevail.   <u>Vaca</u>, 386 U.S. at 191.   Yet, according to Mr.
Montevago, the Union here appealed his grievance to the Systems
Board, presented evidence and witnesses, and cross-examined the
company's witnesses.   Mr. Montevago's Complaint does not
indicate that the union did not vigorously represent him, but
only that they did not take certain actions that he believes
that they should have taken in his defense.   The vast majority
of his allegations are that they failed to call certain
witnesses, ask certain questions, and introduce certain

---

three months despite repeated requests for it.   Mr. Montevago
appears to allege in his Complaint that this also was a breach
of the Union's duty of fair representation, but Mr. Montevago
fails to provide any legal argument in support of that
contention in his opposition.   Even if the failure to provide
Mr. Montevago with the decision could be found to be arbitrary,
discriminatory or in bad faith, Mr. Montevago fails to show how
the delay injured him in any way.   Thus, the Court cannot find
that this allegation would be sufficient to find a breach of the
duty of fair representation.   <u>See</u> <u>Spellacy v. Airline Pilots</u>
<u>Ass'n - Int'l</u>, 156 F.3d 120, 126 (2d Cir. 1998)("Establishing
that the union's actions were sufficiently 'arbitrary,
discriminatory or in bad faith,' is only the first step toward
proving a fair representation claim.   Plaintiffs must then
demonstrate a causal connection between the union's wrongful
conduct and their injuries.") (citing <u>Ackley v. Western</u>
<u>Conference of Teamsters</u>, 958 F.2d 1463, 1472 (9th Cir. 1992);
<u>Williams v. Romano Bros. Beverage Co.</u>, 939 F.2d 505, 508 (7th
Cir. 1991)).

evidence.  Such failures, without more, are generally not
significant enough "to justify inquiry into the merits of an
arbitral award."  Hardee v. North Carolina Allstate Services,
Inc., 537 F.2d 1255, 1258 (4th Cir. 1976) (holding that a
failure to interview and call certain witnesses, and cross-
examine others was "not of sufficient magnitude to justify
inquiry into the merits of an arbitral award").  Cf. Black v.
Ryder/P.I.E. Nationwide, Inc., 15 F.3d 573 (6th Cir. 1994)
(finding that, as the employee had been represented by a union
rival with whom he had an acrimonious relationship and who
failed to interview the witness that would have provided crucial
evidence upon which the case turned, the union's conduct could
be considered to be arbitrary and unreasonable, or that the
union was motivated by bad faith or discriminatory animus.)
Thus, Plaintiff has not alleged sufficient facts to state a
claim that the Union breached its duty of fair representation.
As there is no breach of the duty of fair representation, the
breach of the CBA claim cannot stand against U.S. Airways and
Plaintiff's Complaint will be dismissed.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motions will be granted.  A separate order will issue.

_____/s/_____

William M. Nickerson
Senior United States District Judge
December 11, 2009